UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

ADEWALE OLUKAYODE *et al.*,

                               Plaintiffs,

              -v-

CITY OF NEW YORK *et al.*,

                             Defendants.

25 Civ. 1232 (PAE)

<u>OPINION & ORDER</u>

---

PAUL A. ENGELMAYER, District Judge:

This decision resolves a motion to dismiss in this case raising claims of police misconduct.  Plaintiffs sue the City of New York (the "City") and former high-level City officials (collectively, "defendants"), pursuant to 42 U.S.C. § 1983, for injuries and arrests they allegedly suffered at the hands of New York City Police Department ("NYPD") officers during the George Floyd and Black Lives Matter ("BLM") protests in 2020.  Defendants now move to dismiss the First Amended Complaint ("FAC"), under Federal Rule of Civil Procedure 12(b)(6).  They mainly argue that plaintiffs' claims are time barred and not subject to equitable tolling under *American Pipe & Construction Co. v. Utah*, 414 U.S. 538 (1974) ("*American Pipe*").

For the following reasons, the Court grants the motion in part and denies it in part.

## I.      Factual Background[1]

---

[1] The Court draws the facts in this decision from the FAC and the materials appropriately incorporated by reference in it.  Dkt. 25; *see DiFolco v. MSNBC Cable LLC*, 622 F.3d 104, 111 (2d Cir. 2010) ("In considering a motion to dismiss for failure to state a claim pursuant to Rule 12(b)(6), a district court may consider the facts alleged in the complaint, documents attached to the complaint as exhibits, and documents incorporated by reference in the complaint.").  In resolving defendants' motion to dismiss under Rule 12(b)(6), the Court accepts all factual allegations in the FAC as true and draws all reasonable inferences in plaintiffs' favor. *See Koch v. Christie's Int'l PLC*, 699 F.3d 141, 145 (2d Cir. 2012).

### A.      The Parties

The five plaintiffs—Adewale Olukayode, Michelle Moran, Mor Talla Ndiaye, Maximillian Silver, and Blake DeVlieger—are residents of New York City.  FAC at 9.[2]

The City is a municipal entity created by New York state law.  It is responsible for the NYPD.  The FAC also names three individual defendants, in their individual and official capacities, who held City office during the 2020 period at issue: (1) Mayor Bill de Blasio; (2) NYPD commissioner Dermot Shea; and (3) NYPD chief of department Terence Monahan. *Id.* at 10.

### B.      Black Lives Matter Protests and the City's Curfew

Between May 28 and May 31, 2020, protests occurred throughout the City in response to the killing of George Floyd by Minneapolis police.  *Id.* at 12.  According to the FAC, these were largely "peaceful," although some NYPD officers were injured and property was damaged.  *Id.* The NYPD "pepper sprayed and struck protesters with batons," and "hundreds of protesters" were arrested.  *Id.* (cleaned up).

On June 1, 2020, then-Governor Andrew Cuomo and Mayor de Blasio imposed a citywide curfew, barring public activity between 8 p.m. and 5 a.m.  *Id.* at 13.  Knowingly violating the curfew was a class B misdemeanor.  *Id.*  The curfew exempted from its prohibitions, among others, "essential" personnel and activities, including "police officers, peace officers, firefighters, first responders and emergency medical technicians, individuals travelling to and from essential work and performing essential work, people experiencing homelessness

---

[2] The FAC errantly repeats paragraph numbers 72 through 133.  The Court accordingly cites the FAC by page number.

and without access to a viable shelter, and individuals seeking medical treatment or medical supplies." *Id.* at 14.

Between June 2 and June 4, 2020, protests continued throughout Manhattan, Brooklyn, and the Bronx, resulting in hundreds of arrests by the NYPD. *Id.* The FAC alleges, for example, that in the Bronx's Mott Haven neighborhood on June 4, NYPD officers purposefully trapped— or "kettled"—protestors minutes before the 8 p.m. curfew. *Id.* at 15. The officers then struck protestors with batons, used pepper spray, and made mass arrests, largely predicated on ostensible curfew violations. *Id.* at 16. It alleges that Monahan was physically present at this incident, *id.* at 15, and that Shea later stated publicly that the police operation had been "executed nearly flawlessly," *id.* at 22.

On June 7, 2020, de Blasio lifted the curfew. As alleged, the NYPD had arrested some 1,350 individuals—mostly people of color—for curfew violations. All charged violations of the curfew stemming from the BLM protests described above were eventually dismissed. *Id.* at 17.

### C.      Plaintiffs' Interactions with NYPD Officers

*Moran*: Moran is a 22-year-old Bronx resident who, in May 2020, was about to graduate from high school. Around 4 p.m. on May 29—before the curfew had been issued—she joined a protest at the Barclay's Center in Brooklyn and began marching down Flatbush Avenue. By approximately 10:30 p.m., she had reached Warren Street and 5th Avenue (in Brooklyn). There, she saw NYPD officers arrest her brother. When she asked a nearby officer why her brother was being arrested, the officer told Moran to "back up." "Immediately thereafter," "an unknown member of the NYPD grabbed [] Moran by her sweatshirt" and "threw her into the street," where she hit the hood of a police car. After being examined by a City medical technician in an ambulance, she took the subway to a hospital in the Bronx. Doctors there diagnosed her with a

"severe right wrist fracture" and placed her in a cast for three weeks.  She also experienced "intense pain, soreness, and bruising to her back."  Her injuries made it "extremely difficult" to study for exams and otherwise participate in the last weeks of high school.  *Id.* at 26–28.

*DeVlieger*:  DeVlieger works in retail operations.  Around 4 p.m. on May 30, 2020, DeVlieger joined a protest at Bedford Avenue and Snyder Avenue in Brooklyn.  Many NYPD officers at the protest had tape over their badges, and had turned off or covered their body-worn cameras.  The FAC alleges that DeVlieger was first kettled onto the sidewalk by officers, but then "was standing on the crosswalk when he was hit on the head with a baton" by an officer.  He went to a hospital, where he received five stitches and was diagnosed with a concussion.  Since the injury, DeVlieger has a sensitive scar on his head, experiences light sensitivity, and has chronic migraines.  He suffers from anxiety and depression, fears law enforcement, and requires "sleep aids."  He quit his previous job as a model because it involved "bright lights and flashes," and he now requires "significant accommodations" to undertake his current work as a producer.  *Id.* at 33–35.

*Ndiaye*:  Ndiaye is a 30-year-old personal trainer.  On May 30, 2020, he joined a protest in Harlem, which traveled south until it reached the area near 24th Street and 7th Avenue.  Around 7 p.m., NYPD officers instructed the protesters to move to the sidewalk.  Ndiaye was already on the sidewalk, and remained there.  An NYPD sergeant "charged at" Ndiaye, who "initially froze" but then "moved out of the way and began to run."  An unknown officer "drove his bicycle, at full speed, into [] Ndiaye's leg."  Ndiaye fell to the ground, and multiple officers "jumped on top of him" and ripped off his shirt.  An officer handcuffed Ndiaye "excessively tightly with metal handcuffs in a painful arm position."  Ndiaye repeatedly requested that the handcuffs be loosened, but officers refused.  Ndiaye was taken to a precinct and placed in a

4

crowded cell, where the metal handcuffs were replaced with flex-cuffs applied "extremely tightly" to his wrists.  He requested that these be loosened, but that request was denied.  Around 10 a.m. the next morning, Ndiaye was issued a desk appearance ticket for resisting arrest and two counts of disorderly conduct, and released.  When he later sought a copy of the criminal complaint against him, a criminal court clerk informed him that the charges "had been dropped." After the incident, Ndiaye's right leg was "extremely swollen," which prevented him from walking for the next two weeks.  He currently cannot run, walk for long periods of time, or jump. *Id.* at 28–30.

*Olukayode*:  Olukayode is a 34-year-old professional photographer.  In the "early afternoon" of June 3, 2020—a day on which the 8 p.m. curfew was in effect—he began taking photos of a BLM protest on 14th Street in Manhattan.  As the protest continued north, he followed and continued photographing it.  When it reached 5th Avenue and 59th Street, "it was met by a line of NYPD officers."  One such officer struck Olukayode's forehead with a baton, causing him to bleed, fall off the sidewalk, break his $5,000 camera, and twist his ankle. Olukayode went to a hospital, where he received four stitches for the laceration on his forehead, leaving a scar.  He could not walk for three weeks, due to his ankle injury.  At the time, he was enrolled in an educational program and missed some eight weeks of classes after the incident. *Id.* at 24–25.

*Silver*:  Silver is a 35-year-old activist.  Around 3 p.m. on September 17, 2020—months after de Blasio lifted the curfew—Silver marched with protestors "to the West Side highway in Manhattan," walking a CitiBike he had rented.  Shortly after Silver joined the protest, NYPD officers instructed protesters that it was "illegal to congregate in the street."  Silver walked to the sidewalk.  Officers then "falsely" told the protesters that it was illegal to congregate on the

sidewalk. They "violently pulled [Silver] over the CitiBike and surrounded him on the ground" of the sidewalk, damaging his glasses. An officer applied flex-cuffs "so tightly that [] Silver began to lose feeling in his fingers." Officers first refused Silver's requests to loosen the cuffs, but an NYPD captain later removed them with a pair of wire cutters, cutting the skin on Silver's wrists. Silver was taken to 1 Police Plaza, where he was photographed, searched, fingerprinted, and put in a holding cell. Around midnight, he was released with a desk appearance ticket and charged with obstruction of governmental administration. Later, at arraignment, he was offered an "adjournment in contemplation of dismissal," which he accepted. *Id.* at 30–32.

D.    **Investigative Reports Concerning the NYPD's Response to the BLM Protests**

*New York Attorney General*:  In July 2020, the New York Attorney General issued a preliminary report on the NYPD's response to the May and June 2020 BLM protests ("AG Report"). It described receiving numerous allegations of excessive force, kettling, and false arrests at the protests, and similar treatment of the press, legal observers, elected officials, and essential workers. It found that NYPD officers had "misuse[d]" flex-cuffs, covered their badge numbers, and failed to wear protective face coverings to prevent spreading COVID-19. *Id.* at 20.

*New York City Department of Investigation*:  In December 2020, the City's Department of Investigation issued a report on the NYPD's conduct during the 2020 BLM protests ("DOI Report"). It found that the NYPD had used crowd control tactics that "led to excessive force," made decisions without adequate "context or proportionality," and deployed officers who "lacked sufficient training in responding to protests." It found that NYPD policies did not distinguish riots from peaceful, First Amendment–protected activities. It found that approximately 2,047 people had been arrested during the protests between May 28 and June 5, 2020, with Black arrestees disproportionately charged with felonies. *Id.* at 20–22.

*Human Rights Watch*:  In September 2020, Human Rights Watch issued a report on the

June 4, 2020 Mott Haven protest.  It criticized the "preplanned and coordinated" kettling of

protesters there before the 8 p.m. curfew, and the excessive force used against, and mass arrest

of, those demonstrators.  *Id.* at 22.

### E.    The NYPD's Responses to Non-BLM Protests

The FAC alleges that the NYPD's "violent response" to BLM protests contrasts with its

measured treatment of pro-police and "similar" protesters.  *Id.* at 17.  For example:

- On July 11, 2020, the NYPD made "no arrests" at a "Rally to Back the Blue" in Dyker Heights, Brooklyn, despite such protesters "yell[ing] at," "grabbing," and "spitting" in the faces of counter-protesters.  *Id.*

- On July 13, 2020, "Blue Lives Matter" groups marched in Bay Ridge, Brooklyn. Members of this group allegedly "assaulted" counter-protesters, but NYPD officers instead arrested two counter-protesters, despite a pro-police demonstrator "punch[ing] a woman in the face" in front of them.  *Id.* at 18.

- On December 2, 2020, hundreds of people protested the closing of a bar for violating COVID-19 regulations.  They blocked traffic and congregated in the streets and on sidewalks, but the NYPD made no arrests.  *Id.* at 19.

The FAC also alleges that the NYPD, between the 1990s and the present, treated "right-wing

extremists" permissively.  *Id.*

### F.    The NYPD's Handling of Protests from the 1990s to the Present

The FAC alleges that the NYPD's response to the 2020 BLM protests is "part of [its]

long history of aggressive and unconstitutional policing" of protests since the 1990s.  These

include demonstrations concerning Amadou Diallo's killing in 1999, the World Economic

Forum in 2002, the Iraq War in 2003, the Republican National Convention in 2004, and Occupy

Wall Street in 2011 and 2012.  *Id.* at 35–40.

It alleges that the NYPD has failed, since the 1990s, to train its officers to respond

appropriately to First Amendment–protected activity.  In 1997, it alleges, the NYPD's Disorder

Control Unit ("DCU") created the "Disorder Control Guidelines" (the "guidelines"). The guidelines continue, "to this day," to "form[] the core" of the NYPD's protest-response training. In substance, they "copy military tactics . . . designed to deter, disperse, and demoralize" protest groups, including by kettling (which the guidelines term "encirclement") and mass arrests. They address large-scale civil disorder, such as riots, but lack "meaningful direction" as to constitutional means to police First Amendment activities. The NYPD, the FAC alleges, thus has not adequately trained its officers on how to give fair warning before using force or making arrests; on the requirement for individualized probable cause before making an arrest; on how to facilitate protected First Amendment activities; on the proper application and removal of flex-cuffs; and on COVID-19 safety measures. *Id.* at 40–43.

The FAC also alleges that, in 2015, the NYPD created the Strategic Response Group ("SRG"), a "specialized" unit for responding to "disorder-causing events" and "counter-terrorism operations." The DCU was incorporated into this newly formed SRG. NYPD officials stated that the SRG would "not be involved in handling protests and demonstrations," but, the FAC alleges, they "regularly" deployed the SRG to protests, including those at issue here. Although the SRG received criticism for its excessive force, mass arrests, and other unconstitutional conduct—including in individual complaints, public reporting, and federal civil-rights lawsuits—the NYPD has "ignored" or failed to use such information to improve training. *Id.* at 43–50. The FAC also alleges that defendants ratified NYPD officers' unconstitutional policing at protests, and did not adequately monitor or supervise such practices. *E.g.*, *id.* at 55, 63–64.

### G.    Claims and Relief Sought

The FAC brings seven claims against all defendants under § 1983. These allege violations of the First Amendment, based on viewpoint-based retaliation, and deprivation of free-

speech and assembly rights; the Fourth Amendment, based on unlawful seizure, false arrest, and excessive force; the Fifth Amendment, for arbitrary application of the curfew and local regulations; and the Fourteenth Amendment, for selective enforcement of local regulations.  It alleges municipal liability against the City, under *Monell v. Department of Social Services*, 436 U.S. 658 (1978) ("*Monell*"), based on the above constitutional claims.

As to relief, it seeks compensatory and punitive damages; attorneys' fees and costs; and unspecified injunctive and declaratory relief.

## II.    Procedural History

On February 11, 2025, plaintiffs initiated this action.  Dkt. 1.  On July 25, 2025, defendants moved to dismiss the original complaint.  Dkts. 20–21.  On September 5, 2025, plaintiffs filed the FAC.  Dkt. 25.  On September 26, 2026, defendants moved to dismiss the FAC, attaching a declaration and exhibit.  Dkts. 26 ("Mot."), 27 ("Reszytniak Decl."), 28 ("Mem.").  On October 10, 2025, plaintiffs opposed.  Dkt. 29 ("Opp'n").  On October 21, 2025, defendants replied.  Dkt. 33 ("Reply").

## III.    Applicable Legal Principles

To survive a motion to dismiss under Rule 12(b)(6), a complaint must plead "enough facts to state a claim to relief that is plausible on its face."  *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007).  A claim is facially plausible "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged."  *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).  A complaint is properly dismissed where "the allegations in a complaint, however true, could not raise a claim of entitlement to relief."  *Twombly*, 550 U.S. at 558.  In resolving a motion to dismiss, the Court must assume all well-pleaded facts to be true, "drawing all reasonable inferences in favor of the plaintiff."  *Koch v. Christie's Int'l PLC*, 699 F.3d 141, 145 (2d Cir. 2012).  That tenet, however, does not apply to

9

legal conclusions. *See Iqbal*, 556 U.S. at 678. Pleadings that offer only "labels and conclusions" or "a formulaic recitation of the elements of a cause of action will not do." *Twombly*, 550 U.S. at 555.

## IV.    Discussion

Defendants move to dismiss the FAC under Rule 12(b)(6). Noting that plaintiffs filed the original complaint more than four years after the events at issue, they principally argue that plaintiffs' claims are time barred and are not rescued by *American Pipe* tolling. Defendants also move for dismissal of (1) the claims against the three individual defendants, arguing that these are barred by collateral estoppel and make insufficient allegations of personal involvement; (2) the official-capacity claims against the individual defendants, arguing that these are redundant of the claims against the City; and (3) the *Monell* claim, arguing that there are insufficient allegations of municipal liability. The Court addresses these arguments in turn.

### A.    Whether Plaintiffs' Claims Are Time Barred

The statute of limitations for a § 1983 action in New York is three years. *Hogan v. Fischer*, 738 F.3d 509, 517 (2d Cir. 2013) (applying New York's personal-injury statute of limitations, because § 1983 does not specify one) (citing *Owens v. Okure*, 488 U.S. 235, 249–51 (1989) and N.Y. C.P.L.R. § 214 (McKinney 2013)). A § 1983 claim accrues "when the plaintiff knew or had reason to know of the injury which is the basis of his action, *i.e.*, the alleged injury which—according to the plaintiff—amounts to an infringement of that constitutional right." *Mallet v. N.Y. Dep't of Corr. & Cmty. Supervision*, 126 F.4th 125, 131 (2d Cir. 2025) (citation omitted).

The parties agree on the following: Plaintiffs' claims accrued the day each was injured and/or arrested at a protest—*i.e.*, between May 29 and September 17, 2020. State executive orders issued in response to COVID-19, however, tolled the statute of limitations between

March 20 and November 3, 2020 (inclusive).  *See Nwoye v. Obama*, 2024 WL 911753, at \*1 (2d Cir. Mar. 4, 2024) (summary order) (citing *McLaughlin v. Snowlift, Inc.*, 185 N.Y.S.3d 212, 213–14 (2d Dep't 2023)), *cert. denied*, 145 S. Ct. 159 (2024).  Plaintiffs thus had three years from November 4, 2020—*i.e.*, until November 4, 2023—to bring their claims.  They did not file this action, however, until February 11, 2025—some 15 months after that deadline.

Plaintiffs argue that this action is timely, invoking the equitable tolling doctrine of *American Pipe*.  They argue that putative class actions related to the 2020 BLM protests— principally, *Sow v. City of New York*, No. 21 Civ. 533 (S.D.N.Y.)—tolled their claims.[3]  *Sow* was filed January 21, 2021.  On February 22, 2024, pursuant to a settlement agreement, a class in *Sow* was certified that excluded the plaintiffs here.[4]  *See Giovanniello v. ALM Media, LLC*, 726 F.3d 106, 116 (2d Cir. 2013) (*American Pipe* tolling applies between initiation of putative class action and a decision on class certification).  Plaintiffs argue that *Sow* tolled the statute of limitations for the 37 months in between, making this action timely.  Defendants counter that *American Pipe* tolling does not apply because the claims brought on behalf of the putative class in *Sow* did not encompass plaintiffs' claims here.

### 1.    *American Pipe* Tolling

*American Pipe* addressed the interplay between statutes of limitations and federal class actions under Federal Rule of Civil Procedure 23.  414 U.S. at 540.  In 1966, the rule was revised to redress a "recurrent source of abuse," in which members of a putative class would intervene in

---

[3] Plaintiffs cite multiple class actions consolidated under *In re New York City Policing During Summer 2020 Demonstrations*, 20 Civ. 8924 (S.D.N.Y.).  The Court refers to these collectively as "*Sow*," because plaintiffs' opposition almost exclusively addresses the *Sow* pleadings, and the relevant allegations in related class actions track those in *Sow*.

[4] Plaintiffs' counsel here appears to be the same as in *Sow*.

an action once it appeared likely to succeed, but, until then, abstain from doing so to avoid being bound by an adverse result (*i.e.*, "one-way intervention").  *Id.* at 546–47.  The amended rule bound class members by a judgment unless they affirmatively withdrew after class certification. *Id.* at 549; *see* Fed. R. Civ. P. 23(b)(3).  Federal class actions thus became "truly representative suit[s] designed to avoid, rather than encourage, unnecessary filing of repetitious papers and motions."  *American Pipe*, 414 U.S. at 550.

In *American Pipe*, the Supreme Court held that the filing of a putative class action tolls the running of the limitations period for all persons within the asserted class who, after class certification is denied, timely move to intervene.  *Id.* at 552–53.  A contrary result, the Court held, would frustrate Rule 23's principal purpose—"efficiency and economy of litigation"—by forcing potential class members to file "protective motions to intervene" to cover the scenario in which class certification was later denied.  *Id.* at 553.  Such tolling, it held, was consistent with the goals of statutes of limitations.  Such statutes, the Court explained, aim

> to promote justice by preventing surprises through the revival of claims that have been allowed to slumber until evidence has been lost, memories have faded, and witnesses have disappeared.  The theory is that even if one has a just claim[,] it is unjust not to put the adversary on notice to defend within the period of limitation and that the right to be free of stale claims in time comes to prevail over the right to prosecute them.

*Id.* at 554 (quoting *Order of R.R. Telegraphers v. Ry. Express Agency*, 321 U.S. 342, 348–49 (1944)).  These goals are upheld, the Court stated, where a named plaintiff, by filing a putative class action, "notifies the defendants not only of the substantive claims being brought against them, but also of the number and generic identities of the potential plaintiffs who may participate in the judgment."  *Id.* at 555.  That gives the defendants the information necessary to determine "both the subject matter and size of the prospective litigation," regardless whether the suit later proceeds as a class, joint, or individual action.  *Id.*  Later, in *Crown, Cork & Seal Co. v. Parker*,

462 U.S. 345, 353–54 (1983) ("*Crown*"), the Supreme Court clarified that *American Pipe* tolling applies not only to putative class members who seek to intervene in the original action, but to those who file separate lawsuits after class certification is denied.

Relevant here, *American Pipe* tolling requires "sufficient commonality" between the later-filed claims and those in the earlier putative class action, to avoid "unfair surprise" to the defendants. *Benfield v. Mocatta Metals Corp.*, 26 F.3d 19, 23 (2d Cir. 1994); *see also Korwek v. Hunt*, 827 F.2d 874, 879 (2d Cir. 1987) (adequate notice to defendants essential component of *American Pipe* tolling). Both sets of claims must therefore involve the "same evidence, memories, and witnesses." *United Airlines, Inc. v. McDonald*, 432 U.S. 385, 393 n.14 (1977) (quoting *American Pipe*, 414 U.S. at 562 (Blackmun, J., concurring)); *Cullen v. Margiotta*, 811 F.2d 698, 720 (2d Cir. 1987) (same), *overruled on other grounds by Agency Holding Corp. v. Malley-Duff & Assocs.*, 483 U.S. 143 (1987); *Behrens v. JPMorgan Chase Bank, N.A.*, No. 21 Civ. 2603, 2024 WL 1090856, at *2 (2d Cir. Mar. 13, 2024) (summary order) (same); *see, e.g.*, *Benfield*, 26 F.3d at 23 (tolling applied where both actions alleged same commodities-fraud scheme and same witnesses); *Cullen*, 811 F.2d at 720 (same, where "factual basis of [earlier class] action was the same" as that of later action). *American Pipe* does not permit the tolling of "different or peripheral claims" from those alleged in the earlier class action. *Allianz Glob. Invs. GmbH v. Bank of Am. Corp.*, 463 F. Supp. 3d 409, 429 (S.D.N.Y. 2020) (quoting *Crown*, 462 U.S. at 354–55 (Powell, J., concurring)); *see, e.g.*, *id.* (*American Pipe* did not apply to claims alleging similar conduct involving different transactions than those in earlier class action); *Friedland v. City of New York*, No. 24 Civ. 7064, 2025 WL 2733359, at *5 (S.D.N.Y. Sept. 25, 2025) (same, based on alleged police misconduct on same day of, but insufficiently related to, protests at issue in earlier class action); *Franchitti v. Cognizant Tech. Sols. Corp.*, No. 21

13

Civ. 2174, 2022 WL 2657171, at *5–6 (S.D.N.Y. July 8, 2022) (same, where claims in both

actions implicated evidence that only partly overlapped). The doctrine also does not toll claims

based on class action allegations that were "too amorphous" to provide fair notice to defendants.

*Camotex, S.R.L. v. Hunt*, 741 F. Supp. 1086, 1091–92 (S.D.N.Y. 1990) (no tolling, where

"generalized laundry list" of putative class members did not notify defendants of potential later-

filed claims); *see also Davis v. Bethlehem Steel Corp.*, 600 F. Supp. 1312, 1318–19 (D. Md.

1985) (same), *aff'd*, 769 F.2d 210 (4th Cir.), *cert. denied*, 474 U.S. 1021 (1985).

### 2.    Application

The central issue here is whether plaintiffs fall within the putative *Sow* class, as required

for them to benefit from *American Pipe* tolling based on that class action. The Court first

determines the scope of the putative class, and then assesses whether such covers the five

plaintiffs here.

The operative complaint in *Sow* defined the proposed class as follows:

(a) all persons who were targeted for their First Amendment protected activity including being, *inter alia*, unlawfully detained and/or arrested without fair warning or ability to disperse, subjected to excessive force, and/or subjected to unreasonably lengthy and unsafe custodial arrest processing during the New York City protest marches in opposition to police misconduct and in support of police reform from May 28, 2020 through no earlier than November, 2020;

(b) all persons who have been or will be unlawfully detained and/or arrested without fair warning or ability to disperse since May 28, 2020, pursuant to the NYPD's policy, practice, and/or custom of, without legal justification, conducting retaliatory arrests and detentions of individuals protesting in opposition to police misconduct and in support of police reform.

*Sow*, 21 Civ. 553, Dkt. 49 ("*Sow* FAC") ¶ 510 (cleaned up). As to Rule 23's commonality

requirement, the *Sow* FAC stated that the named plaintiffs and class members "were and will be

victimized by these same retaliatory policies of arresting protestors against police brutality

14

without legal justification," in violation of the First, Fourth, and Fourteenth Amendments. *Id.*

¶ 513. As to typicality, it stated:

> The Named Plaintiffs were the victims of the Defendants' policies o[f] arresting, without individualized determinations of probable cause and indeed without probable cause in general, groups of individuals engaged in lawful political protest. The Named Plaintiffs the victims of excessive and unreasonable force in the course of these unconstitutional arrests and, following their arrests, were detained under conditions that were unreasonable, inhumane, excessive and punitive, all in violation of the First, Fourth and Fourteenth Amendments to the United States Constitution and the Constitution and laws of the State of New York.

*Id.* ¶ 514. Of the 11 named plaintiffs, it alleged that 10 had been arrested by the NYPD at BLM protests. *Id.* ¶¶ 129–420. The 11th, Barbara Ross, had been "assault[ed]," but not arrested, by NYPD officers at a BLM protest. *Id.* ¶¶ 208–19. *But see id.* at 2 (table of contents: "Plaintiff Barbara Ross's June 1st Arrest"). The list of proposed class representatives omitted Ross, and consisted entirely of individuals who had been arrested. *See id.* ¶ 510. And the *Sow* FAC's other factual allegations centered on arrest-related conduct by the NYPD—for example, in sections titled "Defendants' Policies and Practices Regarding Arrests—Including Mass Arrests—Without Fair Warning," *id.* ¶¶ 477–89, and "Defendants' Protest Arrest Processing Policies and Practices," *id.* ¶¶ 490–505. The *Sow* putative class thus encompassed individuals arrested by the NYPD, "without fair warning or ability to disperse," at the New York City BLM protests between May 28 and the end of November 2020.

Plaintiffs argue, on several grounds, that the *Sow* proposed class also included individuals allegedly assaulted, but not arrested, by the NYPD. They cite the *Sow* FAC's language defining the proposed class to cover all persons "targeted for their First Amendment protected activity including being, *inter alia*, unlawfully detained and/or arrested without fair warning or ability to disperse, subjected to excessive force, and/or subjected to unreasonably lengthy and unsafe custodial arrest processing" during the protests. *Id.* ¶ 510. They point to named plaintiff Ross,

who, the *Sow* FAC alleged, had been assaulted but not arrested by the NYPD, and cite other allegations of NYPD misconduct in that pleading that do not involve arrests (such as kettling, pepper spraying, and beating protesters). *See, e.g.*, *id.* ¶¶ 464–76. And they argue that *In re New York City Policing During Summer 2020 Demonstrations*, 548 F. Supp. 3d 383 (S.D.N.Y. 2021) ("*NYC Policing*"), which resolved motions to dismiss in six consolidated individual and class actions (including *Sow*), supports that the *Sow* putative class included non-arrestees.

Plaintiffs read the *Sow* FAC too broadly. To be sure, the proposed class definition therein, read literally and in isolation, would encompass anyone "targeted for" First Amendment activity during the New York City BLM protests during the specified time period. And there are allegations in the pleading there that NYPD officers used excessive force against protesters that did not result in arrests. But, properly read as a whole, the pleading makes clear that the proposed class was limited to arrestees. It stated, for example, that Rule 23's commonality requirement was met because the proposed class had been harmed by the NYPD's "retaliatory policies of *arresting* protestors" without legal justification. *Id.* ¶¶ 513–14 (emphasis added). It did not refer there to any other forms of retaliation. Likewise, as to typicality, it alleged: "Named Plaintiffs [were] the victims of excessive and unreasonable force *in the course of these unconstitutional arrests*," and were detained in inhumane conditions "*following their arrests*." *Id.* (emphases added). As to adequacy, it alleged that the named plaintiffs were "*arrested* in New York City, without legal justification, while attending protests against police brutality between May 28 and June 6, 2020 . . . [and] were subjected to Defendants' Protest *Arrest* Processing Policies." *Id.* ¶ 517 (emphases added). And, tellingly, it omitted Barbara Ross—the only named plaintiff who was not alleged to have been arrested—from the list of proposed class representatives. *See id.* ¶ 510. *But see id.* at 87 (in the prayer for relief, including Ross as a

16

proposed class representative, inconsistent with the balance of the pleading).  The *Sow* FAC's

treatment of Ross supports, not undermines, that the putative class was limited to arrestees.

*NYC Policing* does not indicate otherwise.  There, the court held, based on five separate

pleadings in related cases (including *Sow*), that the named plaintiffs in each had adequately

alleged *Monell* liability.  548 F. Supp. 3d at 401–02.  In summing up, it stated that these sets of

plaintiffs had adequately pleaded "a custom or policy of using excessive force and making false

arrests at large protests throughout New York City."  *Id.*  Plaintiffs argue that this language

supports that the *Sow* putative class (or those in related class actions) covered excessive force

claims, in addition to those for arrests.  That is wrong, for at least three reasons.  First, the *NYC

Policing* court did not address the scope of the proposed class, but instead only whether Sow and

the other sets of plaintiffs had adequately pled a custom or policy of unconstitutional conduct to

support *Monell* liability.  Allegations of excessive force, even without arrest, could thus support

the adequacy of such claims by putative classes of arrestees, without expanding the limits of

those classes.  Second, plaintiffs selectively rely on language in that decision which, spanning

five cases, necessarily painted with a broad brush.  That language synopsized its holdings with

respect to the five separate pleadings—two of which were non-class actions that, by definition,

could not trigger *American Pipe* tolling.  *Id.* at 395, 401.[5]  Its summary language, not being

confined to the class actions, thus is not persuasively cited as proof that the putative classes in

the class actions (including *Sow*) encompassed non-arrestees.  Third, the Sow plaintiffs, in an

opposition to the motion to dismiss—an opposition filed by the same counsel who represent

---

[5] *See, e.g.*, *id.* ("The Attorney General and the *Payne*, *Wood*, *Sierra,* and *Sow* plaintiffs plead specific facts from which, if proven, would allow a trier of fact to conclude that NYPD officers engaged in a variety of practices that constituted false arrest, excessive force or retaliation for the exercise of First Amendment rights.").

plaintiffs here—expressly and repeatedly described the putative class as one comprised *solely of arrestees*. *See, e.g.*, *Sow*, 21 Civ. 533 (Apr. 23, 2021), Dkt. 76 at 1 ("Acting according to NYPD de facto policy and custom, NYPD members assigned to police the protests subjected *arrestees* to overlapping policies and practices that caused Plaintiffs to suffer, among other harms, chilling violations of their First Amendment rights, physical and other injuries, false arrests, excessive detentions, and baseless criminal prosecutions." (emphasis added)); *id.* at 3 ("consistent with Defendants' policies and practices regarding making arrests, including mass arrests without fair warning," "virtually all" plaintiffs were "physically trapped, assaulted, *and* arrested" (emphasis added)); *id.* at 4–5 ("Defendants arrested plaintiffs" and subjected them to "onerous, centralized mass arrest processing"). *NYC Policing* thus does not avail plaintiffs.

The principles underlying *American Pipe* tolling, moreover, support that the doctrine does not apply here. Such tolling requires "sufficient commonality" between the earlier putative class action and later-filed claims, so as to avoid "unfair surprise" to defendants. *Benfield*, 26 F.3d at 23 (2d Cir. 1994); *see also Saint-Jean v. Emigrant Mortg. Co.*, 129 F.4th 124, 143 (2d Cir. 2025) ("equitable tolling has always been based on principles of fairness and equity"), *cert. denied*, 223 L. Ed. 2d 507 (Jan. 12, 2026). The earlier class action must apprise defendants "not only of the substantive claims being brought against them, but also of the *number and generic identities* of the potential plaintiffs who may participate in the judgment," enabling defendants to determine the "subject matter and size" of future litigation. *American Pipe*, 414 U.S. at 555 (emphases added). The doctrine thus does not toll "different or peripheral claims." *Allianz Glob. Invs. GmbH*, 463 F. Supp. 3d at 429 (quoting *Crown*, 462 U.S. at 354 (Powell, J., concurring)).

18

A holding here that the putative class in *Sow* extended to individuals injured but not arrested at BLM protests—in addition to contradicting relevant *Sow* pleadings—would vastly expand the number of potential plaintiffs, and the volume, range, and nature of claims, that would be free from an otherwise preclusive time bar. The *Sow* FAC alleges, for example, that the NYPD arrested approximately 2,047 individuals during the protests, but single demonstrations during the relevant period numbered "up to 10,000 individuals." *Sow* FAC ¶ 510; *see also id.* ¶ 120 (Civilian Complaint Review Board received "1,646 protest-related allegations related to 248 incidents" during approximately three-week period). And potential claims by protesters who were assaulted, but not arrested, would, in the main, be unlikely to "concern the same evidence, memories, and witnesses as the subject matter" of *Sow* (or the two other class actions in *NYC Policing*). *United Airlines, Inc.*, 432 U.S. at 393 n.14 (quoting *American Pipe*, 414 U.S. at 562 (Blackmun, J., concurring)). Tolling all such claims would thus present an "unfair surprise" to defendants. *Benfield*, 26 F.3d at 23; *see, e.g.*, *Korwek*, 827 F.2d at 879; *Camotex, S.R.L.*, 741 F. Supp. at 1091–92 ("It would be contrary to the *American Pipe* doctrine to hold that class complaints asserting the generalized grievances of an open-ended group alert the defendant to the identity of those likely to participate in the action against him."); *Bethlehem Steel Corp.*, 600 F. Supp. at 1319 (same).

The Court now considers whether the five plaintiffs here fall within the *Sow* putative class of arrestees.[6] It is undisputed that the FAC alleges that Olukayode, Moran, and DeVlieger

---

[6] Plaintiffs contend that their claims need not actually fall, but need only "arguably" fall, within the *Sow* putative class. The one case they cite for that standard is inapposite. *DeFries v. Union Pacific Railroad Co.*, 104 F.4th 1091 (9th Cir. 2024) merely held that, to end the tolling period under *American Pipe*, a plaintiff who was earlier included in a putative class must unambiguously be excluded by a revised class definition. The issue here, however, is whether plaintiffs fall within the putative class to begin with. Pertinent to that point, *DeFries* "expressly acknowledged the importance of fair notice to the defendants for any tolling of the statute of

were assaulted, but not arrested.  Because the *Sow* putative class did not include non-arrestee protesters, these plaintiffs' claims were not tolled under *American Pipe*.  They are thus time barred.

The remaining two plaintiffs—Ndiaye and Silver—claim to have been arrested.  The Court thus assesses whether each falls within the putative *Sow* class.

As to Ndiaye, the FAC's relevant allegations are as follows.  On May 20, 2020, Ndiaye joined a BLM protest in Harlem that "progressed south until it reached the area around 7th Avenue and 24th Street."  Around 7 p.m., NYPD officers "instructed protesters to move to the sidewalk," where Ndiaye already was and remained.  A sergeant "charged at" Ndiaye, who "initially froze" but then "began to run."  An unidentified NYPD officer "drove his bicycle, at full speed," into Ndiaye's leg, causing "severe injury."  Officers "jumped on top" of Ndiaye, handcuffed and arrested him, and, "shortly after" 7 p.m., transported him to a precinct cell holding more than 100 other people.  FAC at 28–30.

These allegations place Ndiaye within the putative *Sow* class.  He was arrested at a BLM protest in New York City that occurred within the specified time period (May 28, 2020 through November 2020).  And the arrest was made without Ndiaye's having received "fair warning" or the "ability to disperse."  *Sow* FAC ¶ 510.  As alleged, Ndiaye was in compliance with the NYPD officers' commands to "move to the sidewalk" when a sergeant "charged at" him there.  FAC at 28.  To be sure, Ndiaye states that he "began to run" away from the sergeant.  *Id.*  But these allegations do not require the inference—and defendants do not argue—that, as pled, Ndiaye had the ability to avoid arrest by compliance with lawful commands.

---

limitations"; construing the putative class in *Sow* to include non-arrestee protesters would deprive the defendants here of such notice.  *Friedland*, 2025 WL 2733359, at *5 (similarly finding *DeFries* inapposite) (citing *DeFries*, 104 F.4th at 1097–99).

Defendants briefly argue that Ndiaye is outside the putative *Sow* class because the *Sow* FAC did not make allegations specific to that protest. *See* Mem. at 12. *American Pipe* tolling does not require such specificity. For that doctrine to apply, a plaintiff must bring claims that fall within those of an earlier putative class, and Ndiaye falls within the class as drawn in the *Sow* FAC. There is no additional condition that the class must have been pled so as to pinpoint more precisely the circumstances of the plaintiff at issue. Rather, provided the plaintiff falls within the parameters of the putative class in an earlier filed action, *American Pipe* tolling applies (and continues until the plaintiff either opts out of the class or is excluded from it by a class certification decision). *See, e.g.*, *In re Worldcom Secs. Litig.*, 496 F.3d 245, 255 (2d Cir. 2007); *IPO Secs. Litig.*, 617 F. Supp. 2d 195, 199 (S.D.N.Y. 2007); *Choquette v. City of New York*, 839 F. Supp. 2d 692, 698–703 (S.D.N.Y. 2012). Here, because Ndiaye's claims fell within those of the putative *Sow* class, defendants had adequate notice of them. His claims are subject to *American Pipe* tolling and are thus timely.

The fifth and last plaintiff—Silver—is also alleged to have been arrested at a protest, without having received fair warning or an opportunity to disperse. The FAC alleges that NYPD officers at once directed Silver and other protesters to move away from both the street and the sidewalk, apparently leaving him no place to go that did not breach a command. FAC at 30–31. The FAC can be thus construed to allege that Silver did not have an opportunity to avoid arrest. In that respect, its allegations accord with those in *Sow*. However, the FAC does not plausibly allege that the protest at which Silver was arrested was encompassed by the putative classes in *Sow* or related actions. It alleges that, on September 17, 2020, Silver was arrested after marching with a protest to the "West Side Highway in Manhattan." *Id.* at 30. It identifies this protest as "protest number 70" in a reference list in the consolidated *NYC Policing* action. *Id.*; *see* Dkt. 27-

21

1 ("*NYC Policing* Protest List").  That list identifies the protest as having occurred around "Foley Square, Manhattan," as alleged in the operative complaint in *Payne v. De Blasio*, No. 20 Civ. 8924 (S.D.N.Y.) (a related case consolidated with *Sow*).  *NYC Policing* Protest List at 4.  And *Payne*, in turn, described the protest as follows:

> On September 17, 2020, approximately 50 to 60 protestors gathered at Foley Square to protest the treatment of women detained while in Immigration and Customs Enforcement (ICE) custody. . . .  Approximately 20 minutes after the protest began, it was forcefully ended.  In that short period of time officers threw protestors to the ground causing one to bleed from his head and made 10 arrests.

*Payne*, Dkt. 54 ¶ 77 ("*Payne* FAC") (footnote omitted).

Critically here, *Payne* was not a class action.  *NYC Policing*, 548 F. Supp. 3d at 395 (*Payne* was "brought on behalf of a group of identified individuals and was deliberately not brought as a class action" (cleaned up)).  It thus cannot be a basis for equitable tolling of Silver's claims under *American Pipe*.

Plaintiffs argue that Silver's claims nonetheless fall within the putative *Sow* class because the *Sow* FAC (1) "incorporate[d] by reference the factual allegations" in *Payne* and other related cases, Opp'n at 18, and (2) elsewhere defined the putative class based on all "New York City protest marches in opposition to police misconduct and in support of police reform from May 28, 2020" through November 2020, *Sow* FAC ¶ 510.  Neither argument is persuasive.

First, even if *Sow* could be read to incorporate *Payne*'s factual allegations,[7] it does not follow that the putative *Sow* class covered individuals arrested at every protest alleged in *Payne*.  The *Sow* FAC's framing of the putative class controls.  And it does not encompass the protest

---

[7] Parties may "sometimes incorporate facts from outside documents into pleadings," but such "does not permit vague, general references to documents outside the complaint in place of specific allegations putting the court and the defendant on notice of the particular claims asserted."  *Tannerite Sports, LLC v. NBCUniversal News Grp.*, 864 F.3d 236, 251 (2d Cir. 2017) (citing Fed. R. Civ. P. 8(a)); *see also Constellation Energy Commodities Grp. Inc. v. Transfield ER Cape Ltd.*, 801 F. Supp. 2d 211, 223 (S.D.N.Y. 2011).

Silver attended.  That putative class covered all protests in New York City "in opposition to police misconduct and in support of police reform" during the specified period, but the protest Silver participated in was against ICE, not the police.  Plaintiffs argue that "ICE are police" and that "protesting against [ICE's] mistreatment of people in detention is a protest against police misconduct."  Opp'n at 19.  But New York law, which supplies an objective definition, provides otherwise.  *Compare* N.Y. Crim. P. Law § 1.20(34) (defining "police officers" as members of certain law enforcement entities within New York and its subdivisions) *with id.* § 2.15 (separately classifying ICE "special agents, deportation officers, and detention and deportation officers").  And nothing in the *Sow* FAC would have alerted defendants that "police," as used there, was meant to encompass federal immigration officers.  Defendants thus lacked adequate notice of Silver's potential claims to permit their tolling under *American Pipe*.

Moreover, the allegations in the *Sow* FAC, read holistically, bely plaintiffs' portrait of that class as reaching anti-ICE protests.  The allegations there exclusively related to BLM protests sparked by the killing of George Floyd.  The *Sow* FAC is silent as to immigration-related protests.  For example, it began:

> On May 25, 2020, police killed George Floyd.  Almost immediately, protests against police violence and in support of police accountability and the Black Lives Matter movement spread across the United States and the word, including here in New York City where thousands exercised their constitutional rights to protest.  In the days and weeks following Floyd's killing, the [NYPD] engaged in activities that violated the constitutional rights of individuals who were protesting police misconduct . . . .

*Sow* FAC ¶¶ 1–2.  It thereafter referred consistently to the "2020 Black Lives Matter protests," the "George Floyd protests," or similar formulations.  *See, e.g., id.* at 12 & ¶¶ 111, 455, 520.  Likewise, the two investigative reports it cites and "incorporate[d] by reference" were titled, respectively, "Investigation into NYPD Response to the George Floyd Protests" and "Corporation Counsel Report Pursuant to Executive Order 58 (June 20, 2020) Directing an

23

Analysis of Factors Impacting the George Floyd Protests in New York City." *Id.* at 5 n.1, 12 n.2. These reports, which together span some 170 pages, do not mention any immigration-related protest (or any that occurred on September 17, 2020).

Plaintiffs note that there is an allegation in the non-class *Payne* FAC that the NYPD made arrests at a September 17, 2020 protest concerning the "treatment of women detained while in [ICE] custody." *Payne* FAC ¶ 76. But the decisive issue is whether the putative *Sow* class was drawn to give defendants notice of the "number and generic identities" of future plaintiffs such as Silver. *American Pipe*, 414 U.S. at 555. For the reasons above, it was not. Tolling Silver's "peripheral" claim would thus subject defendants to "unfair surprise." *Benfield*, 26 F.3d at 23; *Allianz Glob. Invs. GmbH*, 463 F. Supp. 3d at 429. His claims are thus time-barred. *See, e.g.*, *Friedland*, 2025 WL 2733359, at *5 (*Sow* did not toll statute of limitations for claims arising from arrests too attenuated from BLM protests); *Camotex*, 741 F. Supp. at 1091–92 (*American Pipe* did not apply, where "amorphous" putative class did not give defendants adequate notice of potential later claims); *Bethlehem Steel Corp.*, 600 F. Supp. at 1319 (same).

***Overall assessment***: For the reasons above, the claims of Olukayode, Moran, and DeVlieger fall outside the putative *Sow* class, because those three plaintiffs are not alleged to have been arrested at protests. Silver's claims are also not covered by that putative class, because the immigration-related protest at which he claims to have been arrested was not one covered by any relevant class action. Ndiaye's claim, however, falls within those of the putative *Sow* class. He was arrested at a BLM protest, having been deprived of fair warning or an opportunity to disperse, within the specified time period. Ndiaye's claims are thus subject to *American Pipe* tolling and thus are timely. The claims of the other four plaintiffs are not.

24

**B.** **Whether the FAC Adequately States Claims Against Shea, Monahan, and de Blasio**

The Court now addresses the remaining arguments for dismissal of Ndiaye's claims.[8]

The City next argues that all claims against NYPD commissioner Shea and chief of department Monahan should be dismissed for failure to state a claim.  It argues that *NYC Policing* has preclusive effect, insofar as it found parallel allegations insufficient to state a claim.  Mem. at 14–15.  Plaintiffs agree.  Opp'n at 23.  The Court therefore dismisses all claims against these two defendants.

Defendants also argue, and plaintiffs agree, that the official-capacity claims against Shea, Monahan, and de Blasio must be dismissed as duplicative of those against the City.  The Court thus dismisses all official-capacity claims.

The parties dispute whether *NYC Policing* precludes the claims against de Blasio.  The City argues that all but Olukayode's claims against de Blasio are precluded.  Mem. at 14–15.  Plaintiffs counter that *NYC Policing* allowed claims against de Blasio to proceed (save those related to the curfew order's constitutionality).  Opp'n at 25.  They note that the court in *NYC Policing* found sufficient—to support de Blasio's personal involvement—the allegations that he had admitted "approv[ing] the broad strategies and sometimes very specific choices" related to the NYPD's response to BLM protests on June 3 and 4, 2020.  *NYC Policing*, 548 F. Supp. 3d at 410.  They note that Olukayode alleges that he was "struck . . . with a baton" on June 3, [2020]," *i.e.*, during one of those protests.  FAC at 24–25.  But Olukayode's claim is time barred.  And plaintiffs do not point to any comparable allegations related to Ndiaye, who claims to have been arrested at a protest on May 30, 2020.  The FAC does not allege that de Blasio was

---

[8] The analysis and holdings, in the following sections, would equally apply to the other plaintiffs had their claims been timely.

personally involved in the NYPD's response to that protest.[9]  The Court thus dismisses all claims against de Blasio, under Rule 12(b)(6), for failure to state a claim.

### C.        Whether the FAC Adequately Alleges *Monell* Claims

Defendants move to dismiss the *Monell* claims against the City.  They argue that these do not plead an official policy or custom causing a plaintiff to suffer a constitutional violation.  Mem. at 17–20.  Plaintiffs counter that these arguments are barred by collateral estoppel, because the decision in *NYC Policing* rejected a similar dismissal motion.  They argue that, even if *NYC Policing* is not issue preclusive, the Court should follow its rationale.  Opp'n at 23–25.

Plaintiffs' collateral estoppel argument is not persuasive, because the denial of a motion to dismiss generally does not constitute a "final judgment," as required for collateral estoppel.  *See Coggins v. Buonora*, 362 F. App'x 224, 225 (2d Cir. 2010) (summary order) ("Ordinarily, there is no final judgment where the district court denies a motion to dismiss . . . .").[10]  And here, years of litigation followed the denial of the motion to dismiss in *NYC Policing*.  The Court therefore considers that decision solely insofar as it has persuasive force.

---

[9] The FAC purports to "incorporate by reference the factual allegations" made in certain "related cases," including *Sow*, FAC at 12 n.8, but that does not help Ndiaye (or any other plaintiff).  A pleading "may not adopt other pleadings from a wholly separate action." *Constellation Energy Commodities Grp. Inc. v. Transfield ER Cape Ltd.*, 801 F. Supp. 2d 211, 223 (S.D.N.Y. 2011); *see also Tannerite Sports, LLC v. NBCUniversal News Grp.*, 864 F.3d 236, 251 (2d Cir. 2017) ("vague, general references to documents outside the complaint in place of specific allegations putting the court and the defendant on notice of the particular claims asserted" are not permitted).  And those cases are not formally "related" to this one.  In any event, none of those pleadings alleges de Blasio's personal involvement in the NYPD's alleged mistreatment of any plaintiff here other than Olukayode.

[10] In contrast, the *grant* of a motion to dismiss for failure to state a claim, is a "final judgment on the merits and thus has res judicata effects." *Berrios v. N.Y.C. Hous. Auth.*, 564 F.3d 130, 134 (2d Cir. 2009).

"A municipality cannot be made liable under § 1983 by application of the doctrine of *respondeat superior*, but rather the plaintiff must demonstrate that, through its deliberate conduct, the municipality was the moving force behind the alleged injury." *Lucente v. County of Suffolk*, 980 F.3d 284, 297 (2d Cir. 2020) (cleaned up); *see Monell*, 436 U.S. at 694. "[T]o hold a city liable under § 1983 for the unconstitutional actions of its employees, a plaintiff is required to plead and prove three elements: (1) an official policy or custom that (2) causes the plaintiff to be subjected to (3) a denial of a constitutional right." *Wray v. City of New York*, 490 F.3d 189, 195 (2d Cir. 2007) (quoting *Batista v. Rodriguez*, 702 F.2d 393, 397 (2d Cir. 1983)).

There are four ways to establish the existence of an official policy or custom—the first element of a *Monell* claim. A plaintiff may plead that the constitutional violation was caused by:

> (1) a formal policy officially endorsed by the municipality; (2) actions taken by government officials responsible for establishing the municipal policies that caused the particular deprivation in question; (3) a practice so consistent and widespread that, although not expressly authorized, constitutes a custom or usage of which a supervising policy-maker must have been aware; or (4) a failure by policymakers to provide adequate training or supervision to subordinates to such an extent that it amounts to deliberate indifference to the rights of those who come into contact with the municipal employees.

*Brandon v. City of New York*, 705 F. Supp. 2d 261, 276–77 (S.D.N.Y. 2010) (citation omitted).

The reasoning of *NYC Policing*, finding well-pled an official policy or custom, is persuasive on this point. The court there found, based on nearly verbatim allegations, that the complaints stated viable claims for municipal liability. The pleadings plausibly stated an official custom or practice of unwarranted, "mass arrests of peaceful protesters." *Id.* at 402. They cited, among other things, (1) investigative reports of NYPD misconduct toward protesters beginning as early as the "early 2000s," (2) numerous Civilian Complaint Review Board complaints regarding the NYPD's response to the 2020 BLM protests, and (3) recent reports, including by the City's Corporation Counsel, documenting police misconduct at those protests. *Id.* at 401.

27

The allegations also supported that the City had been deliberately indifferent to plaintiffs' constitutional rights, in that the policymaker defendants had known "to a moral certainty," based on "numerous similar protests," that NYPD officers lacked sufficient training in crowd control and would thus violate protesters' constitutional rights. *Id.* at 403.

This analysis applies with equal force here. The FAC's allegations of an NYPD history of mistreating protesters track those in *NYC Policing*. *See id.* at 401–05; FAC at 13–23, 35–56. And Ndiaye's claim—the only one here that is timely so as to survive—plausibly alleges a constitutional violation following from an official policy or custom.

Ndiaye alleges that, despite having complied with NYPD officers' instructions to move to the sidewalk during the May 30, 2020 BLM protest, he was "charged at" by a sergeant. After he began to run, another NYPD officer drove a bicycle into him "at full speed," causing "severe injury" to his right leg. Multiple officers then "jumped on top of him," and applied metal handcuffs "excessively tightly," denying his repeated requests to loosen them; officers later replaced these with flex-cuffs, which officers also applied too tightly and refused to loosen, despite Ndiaye's requests. He was detained at a precinct for 15 hours. The charges against him were later dropped. *Id.* at 28–30. Consistent with decisions sustaining similar allegations arising from BLM and other protests on motions to dismiss or for summary judgment, the claims as to Ndiaye adequately plead underlying constitutional violations for excessive force, false arrest without individualized probable cause, and First Amendment retaliation. *See, e.g.*, *NYC Policing*, 548 F. Supp. 3d at 401–08; *Torres v. City of New York*, No. 21 Civ. 10832, 2023 WL 2775679, at *1, 4–5 (S.D.N.Y. Apr. 4, 2023) (BLM protester stated claims for false arrest and First Amendment retaliation, where NYPD officers allegedly arrested and detained him for eight hours without first ordering him to disperse); *Jones v. Parmley*, 465 F.3d 46, 59–61 (2d

28

Cir. 2006) (reasonable jury could find excessive force where police "threw several plaintiffs to the ground" without provocation; First Amendment protects protesters from police interference, absent imminent threat of interference with traffic or other immediate threat to public safety); *Dinler v. City of New York*, No. 04 Civ. 7921, 2012 WL 4513352, at *9–12 (S.D.N.Y. Sept. 30, 2012) (granting summary judgment, on false-arrest claims, for protesters merely in proximity to others obstructing traffic); *Cugini v. City of New York*, 941 F.3d 604, 608, 613 (2d Cir. 2019) (reasonable jury could find excessive force based on handcuffs applied too tightly, where plaintiff communicated physical distress).

And the FAC adequately alleges that these violations were caused by the City's official policy or custom. "The pre-discovery pleading standard for a *Monell* custom or practice is not a high bar, and just a handful of instances of similar unconstitutional misconduct, in addition to a plaintiff's own experience, can warrant proceeding to discovery." *Gavin v. City of New York*, No. 20 Civ. 8163, 2021 WL 3774113, at *4 (S.D.N.Y. Aug. 24, 2021) (cleaned up) (quoting *DiPippo v. Cnty. of Putnam*, No. 17 Civ. 7948, 2019 WL 1004152, at *9 (S.D.N.Y. Feb. 28, 2019)). Here, the FAC alleges myriad instances of "similar unconstitutional misconduct," in which the NYPD arrested protesters using excessive force, without individualized probable cause, and without first ordering them (or giving them a genuine opportunity) to disperse. It also cites public investigative reports, federal civil-rights lawsuits, and Civilian Complaint Review Board complaints, spanning a lengthy period. *See, e.g.*, FAC at 20–22, 35–55; *Gavin*, 2021 WL 3774113, at *4 (comparable allegations "permit[ted] the inference of a pervasive problem with NYPD's training" with respect to protest dispersal).

The FAC thus states a *Monell* claim against the City, in that it adequately alleges that an official policy or custom caused the NYPD to violate Ndiaye's constitutional rights. *See, e.g.*,

29

*NYC Policing*, 548 F. Supp. 3d at 401–08; *Gavin*, 2021 WL 3774113, at \*5; *Edrei v. City of New York*, 254 F. Supp. 3d 565, 580–81 (S.D.N.Y. 2017), *aff'd sub nom. Edrei v. Maguire*, 892 F.3d 525 (2d Cir. 2018); *Marlin v. City of New York*, No. 15 Civ. 2235, 2016 WL 4939371, at \*20–21 (S.D.N.Y. Sept. 7, 2016); *Case v. City of New York*, 233 F. Supp. 3d 372, 405–08 (S.D.N.Y. 2017).

**CONCLUSION**

For the above reasons, the Court denies defendants' motion to dismiss Ndiaye's *Monell* claims against the City.  The Court otherwise grants defendants' motion to dismiss.  The Clerk of Court is respectfully directed to terminate the pending motion at docket 26; to terminate all parties in this matter except Ndiaye and the City; and to revise the caption of this case such that the sole plaintiff henceforth is identified as Mor Talla Ndiaye.

By separate order, the Court will schedule an initial conference.

SO ORDERED.

Paul A. Engelmayer

_____
PAUL A. ENGELMAYER
United States District Judge

Dated: June 9, 2026
New York, New York

30